The Honorable, the Judges of the United States Court of Appeals for the 4th Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the 4th Circuit are admonished to give their attention for the Court is now sitting. God save the United States and this Honorable Court. Okay, please, the Court. Now, first of all, we have this case, law firm case, Keyes Law Firm, which I guess is Napoli Bern and Mr. Hurd. It's good to have you back with us. Thank you. It's nice to be back. I'm sorry I can't see you, but it's nice to hear you. Good to have you, sir. You represent the Napoli defendants, is that correct? I represent, yes, the Napoli defendants. Actually, the arguments we're making today are awesome. Napoli, I'll get it better. I had trouble with it, too, you know. My arguments will also relate to some of the positions taken by the NBRS defendants and the legacy defendants. As you know, this case arises out of a fee-splitting dispute between law firms in Maryland and New York, and it implicates not only this Court's jurisprudence on personal jurisdiction, but also this Court's interest in ensuring the fairness of trials. I will address personal jurisdiction, summary judgment, and the decision to conflate 2,000-plus separate association agreements into a single agreement. Hal Walter will address the errors of trial and post-trial motions. When two parties have a series of similar agreements, sometimes there is also an overarching master agreement, and sometimes there are simply separate agreements. It really comes down to two things. One, what does the complaint allege, and then what was the party's intent? Here, the complaint does not allege an overarching master agreement. It alleges 2,174 individual agreements, as we discussed in our reply brief on page 7, and that really should end the matter. But if you look at the evidence of intent, it cuts both ways. So if you get that far, it really is a question for the jury, not summary judgment. Despite these criteria, the trial court in effect conflated 2,000-plus association agreements into a single overarching agreement. A trial judge can do a lot of things to manage a jury trial, but he cannot create a contract where none was alleged or where the evidence is in dispute. Mr. Hurd, could I just ask you, did not your client tell the district court that he viewed all these claims as being in the aggregate? I'm referring specifically to the discovery contempt hearing on May the 28th of 2019, the joint appendix 399. He individually addressed Judge Bennett when he was describing the chaotic nature of his inability to produce discovery, and he himself said all these claims are part of an aggregate. Why should not the district like that since he said that himself? Two things, Your Honor. Number one, I don't know that the district court ever relied upon that passage. I think it has to do with the being aggregate part. I think it has to do, in Mr. Napoli's comments, with how things were managed in his office, not whether there was an overarching contractual agreement. I think he's speaking in terms of the payment. He viewed all the claims together. They took them in batches, which is what the district court did. I think he did exactly what Mr. Napoli said he was doing during that hearing. Well, yeah, we read that a little differently. We took the sense that the trial judge did not really rely upon that. In any event, we believe that the question of personal jurisdiction must be proved contract by contract, and even if you think there was some overarching agreement, then the connections with Maryland were still so tenuous as not to provide personal jurisdiction for anything other than the 40 out of 2,174 cases that involved Maryland clients. Now, the simple thing to have done in this case would have been for the plaintiff to file a suit in New York where they wouldn't have a personal jurisdiction issue, but they did not, and they had to live with those consequences. Now, the NDRS that did contract with the KDLF plaintiff is a New York law firm. No jurisdiction over it in Maryland. The trial court relied heavily upon this court's 1990 decision in English and Smith versus Metzger, but the two cases are really polar opposites. In English and Smith, the out-of-state defendant contracted in Virginia for a Virginia lawyer to do work in Virginia, so there was personal jurisdiction in Virginia. Here, a Maryland plaintiff contracted for an out-of-state law firm to represent thousands of out-of-state clients, out-of-state courts, with the related legal work to perform out-of-state. That does not create personal jurisdiction in Maryland. Now, the trial court also relied upon emails and phone calls between New York and Maryland to negotiate those contracts, but that violates this court's ruling in Consulting Engineers 56153-273. There were a lot of interstate emails and phone calls in that case, but the court said they did not create jurisdiction, and even if there were jurisdiction over NDRS, there was none over Paul Navoli. The very little he did in Maryland, he did for NDRS and not for himself. With respect to assignment, the law is clear. It's like two circuits, that when you assign cases, sign contracts, personal jurisdiction does not go along for the ride, and you assign an authority saying that it does, so there was no personal jurisdiction over Paul Navoli. With respect to summary judgment, the court said, well, there should have been overall accounting, but there was no contractual obligation to provide overall accounting. Well, all the evidence shows about 1,500 individual cases had ended, and individual accounting dealing to KLF. And again, even if summary judgment over NDRS would be appropriate, summary judgment over Paul Navoli cannot stand. Assignment under New York law is a matter of intent. Intent is a matter for the jury, and yet the court took that issue away from the jury and decided on summary judgment. Likewise, piercing the corporate veil can only be done in Maryland to prevent fraud. That was the grounds relied upon by the district court, and yet fraud requires deliberate intention and purpose of cheating and defrauding. Again, a jury issue, not an issue of summary judgment, that issue too should have gone to trial. So jurisdiction, the lack thereof, does not carry the weight for us, but the erroneous brand of summary judgment certainly should. Judge Bennett gave you a trial now, Mr. Hearn. I'm sorry, yes, Ken? Judge Bennett gave you a trial, did he not? A trial only on damages, not on law and relevance. He gave you a trial. Did you preserve all these issues you're claiming here? Yes, sir. They're all preserved? They're all properly preserved. And how many issues are you raising on the field, 30? Oh, Judge, it is a large number. The ones I have gone through, I believe, are very easy to decide in favor. Well, I'm talking about your client, your side of the case. How many issues or claims of error are you raising, 30 or 40 or 105? How many are there? Judge, I think it does go in the teens. It was a badly tried case. It was a badly tried case. You say a badly tried case? A badly tried by the district court. Yes, sir. There were lots of errors there that Mr. Walters had to be happy to address in detail. Yes, right. Mr. Walters, you're the only one we have sticking right now, so we have to deal with... You all are on the same side, I understand. Yes, we are, Your Honor. Just because you divide up the issues doesn't mean we're going to divide up the issues. I appreciate that, Judge. I'll be happy to answer your questions as best I can. We're going to ask the questions of whomever's standing there speaking at the time. That's you. Yes, sir. Judge, I'll be happy to answer any questions the board may have. I'm sorry? I'll be happy to answer any questions the court may have, or if there are none at the moment, I'll pass the time to Al Walter to my left. All right. Now, Mr. Walter? Yes, Your Honor. You are... You're representing what we call the legacy defendants, is that right? Yes, Your Honor. I am representing the... You're ticking for each other, you and Mr. Herder, in the context of the alleged errors. Isn't that correct? I'm sorry. I missed that, Judge. You and Mr. Herder are on the same side of the case, as I read it here. Yes, we are. I'm representing the Napoli defendants. Because only two lawyers were allowed to argue, the NDRS lawyer has given us the baton for them. To the extent that we address issues, it will be on behalf of all the defendants. Okay. Well, we're allowing you to argue. I mean, Mr. Herder got some time to argue, and he saved some time, and you're getting time to argue right now. We're giving an argument. Thank you, Your Honor. There are a lot of cases in this court that we don't give an argument to. We resolve a lot of them without argument, but your fellows are getting an argument. That's not another claim of error, is it? No, Your Honor. This court has not made an error. But let me address the question that Your Honor began with, which is there were a lot of errors made in this case. If I can take a very high-level look, I think the errors flow from two basic problems. One, as my colleague Mr. Herd discussed, is that the court conflated all 2,174 contracts into one. The second is that there were significant inconsistent evidentiary rulings that changed over time. In particular, the court's rulings on what was the so-called settlement database were a real problem. As the court knows from reading the record, after an initial delay by certain defendants in producing a settlement database, plaintiff keys found it highly beneficial to their cause to turn the settlement database into a holy grail, an unattainable goal, so that even when the defendants produced it, which they did, plaintiffs kept complaining that it hadn't been produced. Counsel, you say you did produce the database, but the district court said you did not. This seems like a factual question. The district court was there and knows the difference between a database that's native and a native production and a spreadsheet printout. Why should we find that the district court clearly erred in deciding whether you had or had not produced what you claimed to have produced? Your Honor, because the district court was taken in by the plaintiff's argument, the plaintiff kept arguing that we hadn't produced it. You say the district court was taken in by the plaintiff's arguments? I'm reminded that I'm going to interrupt you a little bit, and I'm not going to hold you to all these time constraints and everything that you're pointing out, but this case reminds me of a case of a long time ago when I was a young lawyer that went up to the Fourth Circuit, and we had a judge here, James Braxton Craven. You ever heard of Judge Craven? I have, Your Honor. I've read numerous opinions from Judge Craven. All right, and Judge Craven, in a case called United States v. Sawyers, made an opinion that he offered in a criminal case, made this comment. On appeal, ingenuous and diligent counsel have taken a shotgun approach to the validity of the proceedings, asserting that reversible error occurred. In that case, 13 respects he specifically mentioned, and then he said, so many points of error suggest that none are valid, and I was reminded of that case as I studied this one. How do you respond to Judge Craven's observation? I understand, Your Honor, and believe me, as we prepared this appeal, we were more than cognizant of the fact that when you have so many assertions of error, it can present a problem. But to address Judge Rushing's question, the native database fields were produced, and they're in the record in Volume 16 of the Joint Record Extract. And so while we didn't produce the native... Sorry, what do you mean by native fields are in an extract? None of that makes sense to me. Native means you can manipulate it. You can use it. You can see when things are really entered and how it really works. Right, and what we produced were all the data that anybody would need in order to figure out what cases were settled, how much they were settled for, where the payments came from, and that the referral fees were produced and sent to the Keyes Law Firm. So the mere fact that we didn't produce the document in native, which was a problem because... And when you say the document in native, you mean the database. I mean, I mean, you know, I format. And it was not produced in an electronic format. It was produced in a spreadsheet because these law firms, as Your Honor knows from reading the record, went through many, many changes. You know, NBRS turned into multiple law firms. I'm not being accurate when I say that, but the data had to be migrated from place to place to place. And so the native you're talking about, where you can see what data was put in when, would not have provided any information that would be useful because all of the data... Does that matter? You're arguing to me that the district court was wrong when he said that you did not produce the database. You're telling me why you didn't produce the database, which may be a great reason. But you're just asking me to say the district court was wrong about whether this evidence that was haggled about for years was or was not produced. And it seems like the district court knows a lot better than we do. And why should we disagree with his ruling here? You seem to be telling me why it wasn't produced rather than telling me in fact that it wasn't. Your Honor, the point is that the plaintiffs made a point to the jury that they didn't have the data, when in fact they did have the data. And when did they get that? This spreadsheet that's not the database, you all it over five days before trial, two months after discovery closes. How can you run a trial like that, particularly of the magnitude of this case? Well, Your Honor, we suggested that the court appoint a special master to do what Your Honor is implying should have been done, which is go through and figure out, for instance, there were well over 700 cases out of the 2000 that had no recovery. So those cases should have been excluded. There were many other cases that were resolved early on for very little money. The money, the referral fees were paid. Those cases were simple and should have been resolved. And that would have reduced the clutter and the magnitude of what the court had left to deal with. You know, I'm not going back and trying to re-argue here why there were delays in terms of getting the data produced. The fact is the data was produced and then the court, through a series of rulings, changed the ground upon which the trial was based. The first thing the court said was, okay, it's five days before trial and you've produced the data. We're going to allow that data into evidence. Based on that ruling, the court then allowed the plaintiffs to put on an expert who testified extensively about that data. But then when it came time for the defendants to respond, the court changed the ground rules and said, I'm not going to let you respond to that data. The court excluded the evidence. We wanted to put the spreadsheet into evidence. Counsel, sorry, I realize that your time is on step, but I read a lot of testimony from your claiming changed. I mean, the district court didn't let you put up an exhibit and claim that it was the database and it wasn't, but the district court let you talk about the data, dispute the numbers, dispute their experts, discussion of the numbers. There was a lot of discussion about the data, even if you didn't show the, what you claim was the database. Your Honor, I don't think the record supports that. There were numerous witnesses, including Mr. Gilman, who were excluded in their entirety. Mr. Napoli was prevented- Well, that was for a different reason, right? That's because you didn't disclose him properly. But we did disclose him properly. And the truth is all these rulings are reviewed here for abuse of discretion? Well, I'm not sure I want to blanket statement that way, but certainly some of them are. And- How many of them are? You've got 35 or 40. How much percentage of them are abuse of discretion? 95? I haven't counted the number of issues, Your Honor, so I honestly can't- And Judge Bennett is a, he's no novice in this area. He's tried cases as a lawyer, prosecuted cases, defended cases. He's been a judge for 20 years or more. He's been around the track a few times. Your Honor, there's no question that Judge Bennett is an experienced jurist. But in this case, he went off on the wrong foot. And by virtue of his changing the rulings on the And ultimately what happened, Judge, is he allowed the plaintiffs to, in their rebuttal closing, when defendants had no opportunity to respond, to tell the jury that the defendants had not produced the data about the settlements because the defendants were convinced that the data about And that was simply not true. We had produced the data about the settlements. The court didn't allow us to put it into evidence, but the plaintiff's lawyer literally taunted us in his rebuttal closing and said, they didn't put in the evidence, and you've got to ask yourself why. And I was prevented from being able to tell the jury why. It was because the court changed the ruling. And that, in and of itself, created such an unfairness. We moved for a mistrial. The court denied the mistrial. But it's very clear what the jury did. Did you move for a mistrial during the closing argument? I'm sorry, Your Honor? Did you move for a mistrial during the closing argument? As soon as the closing argument was done, I believe, Your Honor. Honestly, it's been two or three weeks. I don't know if it was done immediately or not. Don't you have to do it at the real high point in time, because it's not going on, if you think it's wrong? Your Honor, I apologize, but I cannot recall when it was done, the record would reveal that. I'm sorry. Your Honor, I mean, there were any number of other things that I wanted to get to. It looks like, you know, I'm over the time. I'm happy to answer any other questions or if my colleague will answer questions. Judge Rushing, Judge Novak, do y'all have any further questions for Mr. Walter? No, sir. I'm fine. Thank you. Thank you, Mr. Walter. And you can have some additional time, according to my cheat sheet here. And let's turn to the other side, and Ms. Lewis, are you there? I'm here. Can you hear me? Ms. Lewis, yes, ma'am. Good to have you with us. Thank you, sir. May it please the court. A majority of the issues the appellants present, and since the question was what was the count, I can tell you between the two sets of appellants, it's 21. A majority of those issues derive from one basic fact, and that is that Judge Bennett did not allow the appellant to present the false impression to the jury that their records were meticulously maintained, that they had complied with their discovery obligations, that they had provided a full accounting of settlement to the subject client. When the facts at issue are reviewed in that context, it's crystal clear that the district court acted well within its discovery violations, and it's clear to me that you all have already reviewed the joint appendix. I will note that we have a timeline of discovery violations that are at joint appendix 4123. I will also mention that at the Shill Clause hearing, Mr. Napoli's attorney at the time said, quote, you cannot just push a button and get this information, end quote. So this database that Mr. Walter was referring to in his argument clearly didn't exist as of May 2019. So Keyes Law Firm recognized it could not rely on Napoli for the information, and as a result, served subpoenas on the asbestos defendants in the underlying cases, and those productions revealed substantial discrepancies between the data produced by the non-interested third parties and what Napoli had been reporting, and that's even in the context of information provided in the Shill Clause order. So at trial, excuse me, can I ask you a question about the discovery sanctions, the attorneys fees? This is a nitty-gritty question, but there's a dispute about the interest rate, and I left your brief a little unclear on whether you agree that the interest rate should be changed to the federal rate, or you don't dispute it, or whether you think we can or we must change that rate on appeal. What's your position on that? So in a quick note in the brief, we did note that there's authority that suggests that it should be the federal rate, and so we wanted to acknowledge that. We do believe, given the sanctions context, the Judge Senate did have discretion to fashion a remedy under Rule 37C, and that rate could be reviewed as part of that remedy, but as I think you're noting, there is an authority suggesting that federal rates should apply. Is that something that can be waived? I know the authority that you cited us to is an unpublished case from our court where we say it's mandatory, which I'm not sure what we mean by that, other than it's the law, which is the case with a lot of things that we let people waive. Do you have any, I know this is, again, this is a big case and this is a tiny issue, but I was a little unclear on whether that could be waived or not by their failure to object. I mean, I would submit that they did properly preserve it, and it could be waived, although again, you know, if the question is what's mandatory, I guess the question is, you know, whether it is waivable, and I have to say, Your Honor, I don't know the answer. We felt obligated to present that authority. It was not clear to us. Did I ask a broader question now about the sanction order, counsel? And that's this. I'm a little concerned about whether there's adequate factual findings on that order. There's no question in my mind that there is just rampant discovery abuse here by your opponents, but in the order, the only record that Judge Bennett pointed to was the hearing, and during the hearing, he only talked about Mr. Napoli, but then the sanction order itself applied to not just Mr. Napoli, but all the alter egos then as well. Don't we need a record that addresses not just why he imposed the sanction against all the alter egos, but also he just, I think he said he looked at the Johnson factors, and I don't know if it was eight of them or two of them or whatever it was, applicable, but he didn't do any analysis. Don't we need the district judge to do the actual analysis and supply a factual record as to why that sanction was supported? Yes, Your Honor, and I would agree, well, two things. First of all, with respect to the Johnson factors, and I believe there are 10, he did expressly in his order incorporate the analysis that we included in our fee application, and I think that is sufficient. I mean, the Johnson factors are pretty rough, like the rate, the types of tasks and stuff, so I think that is sufficient. With respect to the number of defendants at that time that were covered by the order, the order to show cause that led to the hearing on May was issued to all of the defendants, and I mean, there are parts of the transcripts where Judge Bennett is referring specifically to Mr. Napoli, but it's clear that that hearing, that show cause hearing was given notice to all of the defendants, and then Mr. Napoli was appearing on behalf of everyone. Yeah, but he says on, if you look at on page 421 of the joint appendix, he specifically says that the award of the attorney's fees will be directly against Mr. Napoli individually and no one else, because I'm convinced that he's the one responsible with respect to the discovery matters in this case. The problem is then that the order that he issued down the road, which incorporates this transcript, addresses all the many alter egos, and I think it's a little troublesome. Don't you agree? I wish he had made it clear that he was also making it against Mr. Napoli as the alter ego of all of these entities. Okay, that's fine. Satisfied. Was there a but in there, further explanation out of that? Thank you, your honor. Well, I think as the record progressed, to be clear, I think Judge Bennett was going out of his way to be civil to Mr. Napoli. He came out of there and said, I'm going to craft a remedy under Rule 37C instead of holding you in contempt, and so I think he was going out of his way to be generous, and so I think when the order later issues, it's a Rule 37C obligation that should apply to all the defendants. They all had discovery obligations. They all delegated those to Mr. Napoli. I mean, he was their 36th rep. He was the signatory on their answers to interrogatories. He was the guy. So, you know, I do think he was fair to, if you could say he was changing his mind, it was fair for him to change his mind at that point. Yeah, but I mean, couldn't this just be cured by a simple remand down to Judge Bennett, and he could just address it himself and write an opinion and say, I'm going to give the whole 316 again, but here's the reasons why, and just give a better explanation. Couldn't that just, isn't that the easy fix here? I think that would be an easy fix, your honor. Okay. I was going to turn to personal jurisdiction. I'm happy to, because I see I'm out of time. I'm happy to submit on the papers. I did want to note that I do think Mr. Hurd's reading of English and Smith v. Metzger is a little unfair in the sense that actually there were our performance on both sides of a contract and all the performance in this arrangement between KLF and Mr. Napoli. KLF's performance happened in Maryland. Mr. Napoli made a trip to Maryland to meet with Mary Keyes, and respectfully, I think there are more contacts here on the part of Mr. Napoli with the state of Maryland than there were with a California attorney in the English v. Smith case. So I think if anything, that case suggests that personal jurisdiction here over Mr. Napoli is perfectly proper. With that, I'm happy to answer more questions or sit down. Thank you, Ms. Lewis. Mr. Schuster. Yes, sir. Thank you. I'm pleased to report. It's nice to be here. I wish it were in person. I want to say two brief points about our cross appeals. One has to do with the constructive trust. They didn't address this in their brief and accordingly, the arguments are waived with respect to that issue, and we'll submit on our brief with respect to that issue. I also want to talk very briefly about the set off that Judge Byrne applied to the judgment for, I'm sorry, Judge Bennett applied to the judgment for Mr. Byrne's settlement with KLF. One of the key issues there is whether Mr. Byrne is a co-obligor with Mr. Napoli. That issue is subsumed to a large degree in the assignment issue, which I'll talk about in a few minutes. There are other issues why the set off we believe was inappropriate, but the main issue there is whether Mr. Byrne was a co-obligor. Well, you thought he was. You sued him, didn't you? We did think he was. And then we... Didn't that kind of end it right there? No, it doesn't. It's still the burden of the non-settling defendant to establish with evidence co-obligor status, and that wasn't done. And it wasn't done because it's actually not accurate. Mr. Byrne was not an obligor with respect to any of the keys cases that were assigned to Mr. Napoli. What did Mr. Byrne pay you for then? He gave you $300,000. Was that for these contracts, or was that a donation? Well, under New York law, it's called a voluntary thing. And unless it's a payment pursuant to a joint co-obligation, then it's not something that can be set off under the New York statute. And it's their burden to... We're just talking about, I mean, I appreciate there's some New York statutes here that apply in lots of contexts, not just when we're talking about co-defendants and a fixed obligation, a fixed amount of money. But here, everyone's looking at this universe of contracts, and those are the damages in this case. And there's no argument that there's additional money outside of the damages from those contracts, the fees that you're owed on those contracts. So, if he gives you money to pay for those contracts and you get money from Napoli as well, and the jury says X amount is the total amount you're owed, why don't we have to subtract what Byrne gave you from X? Because that's what the jury said you're entitled to, is a total sum. Right. And that does make common sense to me, Your Honor, but that's not how the statute works. And that's the best answer I can give you. Under the statute, the non-settling defendants all have to establish that they are co-obligors in order to get an offset. That's how the New York statute works. Well, the problem with that... So, you're saying it's not your... Sorry, Judge, go ahead. Go ahead. I'm just confused about you're saying you sued him, but you don't have to prove he owed you that he's obligated. He doesn't, by paying you, he hasn't admitted he's obligated. And instead, other defendants have to prove that he was obligated to pay you under these contracts. Right. If we had sued him and not settled with him, it would have been our burden to establish that he had liability on the contract. But that didn't happen. So, there was no evidence of Mr. Byrne's obligation. And in fact, the reason we didn't proceed against him is because we learned eventually in discovery that all of the cases were assigned to Mr. Napoli. We thought at the beginning of the case that they followed basically a coin flip procedure that's in their settlement agreement so that 50% of them went to Mr. Byrne, 50% went to Mr. Napoli. That's actually not how it happened because they negotiated a different arrangement for the asbestos cases. So, they all went to Mr. Napoli and Mr. Napoli agreed to indemnify Mr. Byrne for any liabilities associated with it. So, as a matter of law and undisputed fact, Mr. Byrne was not a co-obligor and by operation of the statute, they're not entitled to an offset. But you still took $300,000. You didn't just voluntarily dismiss against him and say, hey, we found out you have no liability, so we're just going to dismiss it. You settled, you negotiated with him, right? So, you're clearly suggesting to him that he had some kind of Let me ask you something else, though. Did you not withhold the settlement terms until after the trial? The settlement, the fact of the settlement was available, the actual dollar amount was not available. So, the settlement agreement itself was not produced before the verdict. So, the Napoli defendants tried to do a cross-claim at the last minute after finding out about your settlement. That was precluded. You're essentially saying they had a burden as an affirmative defense at trial to establish that they're co-obligors, but you didn't even disclose the existence of the $300,000. Don't you think that would put them in a bad position to make the offset argument that's provided for under 103? No, because all they needed to know was the fact of the settlement. The amount is not something that the jury would get involved in. Of course they would. That would go to the amount of the reduction of the damages, which is what Judge Bennett did since you didn't disclose it before the trial. Well, no. The jury would give an overall amount, and then Judge Bennett, post-trial, would, by operation of the statute, determine is it the fractional share that's the appropriate reduction? Is it a dollar-for-dollar reduction? But under the statute, all they have to do is show co-obligor status with Mr. Byrne, which they didn't do at trial. Your Honor, I'd like to very briefly address Mr. Hurd's discussion of the 2,174 mini-trials that he was hoping to have. There were profound discovery violations, and their refusal to provide an accurate accounting of the money they recovered ensured that it would be impossible to do it that way. Appellants themselves realized this only a couple weeks before trial. They asked for the appointment of an independent auditor. Of course, that was after telling the judge over and over and over again that they had to reduce an accounting, that their numbers were solid. But at the very last minute, they tried to do that. And here's what they said. These are their words, not mine. They said, even in a perfect world, trying 2,174 separate breach of contract actions to a jury would be extremely time-consuming, expensive, and complicated. It would take 362 six-hour trial days to present just the evidence on this one question. The jury would have to make at least 4,348 separate findings. Well, it wasn't an error for Judge Bennett to decline to do it that way. Everybody, including the defendants, were operating in the aggregate. Their own expert witnessed it in the aggregate. Mr. Napoli and Ms. Keyes agreed to an overall fee-sharing arrangement that would aggregate settlements. When they expensed the cases, they did it in the aggregate, allocating expenses across thousands of people. Finally, on this point, I do believe they mischaracterized our complaint. We had two breach of contract counts, one against NBRS, one against the other defendants. In each breach of contract count, we asked for a global amount that was due under all the contracts. We did not have 2,174 individual counts. I know I'm out of time, and I'm happy to field some questions. Judge King, may I ask one question of counsel? I know we're over time. Please do. Go right ahead. You can ask your question as long as we're asking them, Mr. Shuster. That would be the best way to do it. If I'm asking a question, you just stay right there. I will do that. It's about count six. I know you're relying on your brief, but I want to ask you what the remedy is on that. It seems to me that the decision to knock out that count was based on a letter that's delivered the night before. If we were to find that was there, is the remedy to reinstate the count and have a trial on that count, or since it went out on a standing issue, would it be better to remand to the district court to make further findings about standing before making a final decision? I think one of the issues here is the lack of the record in terms of deciding what the bankruptcy firm actually surrendered. It seems to me from reading the letter, and just the letter alone, that they surrender their claims only against your client, not against the other side. Standing is a pretty big issue. Don't you think a factual inquiry on remand would be better than just reinstating the account itself is what I'm suggesting to you? I think the letter is on its face clear as to what it does. For that reason, I don't think a remand is necessary. I do appreciate the question. If there's any doubt about what the bankruptcy firm's lawyer was doing in that letter, then I suppose factual findings would be appropriate. I think the face of the letter makes it very clear that they're only telling the Keyes Law Firm that it's not okay. Thank you. That's all I have. Mr. Schuster, you've been involved in this case all the way through? Yes. Ms. Lewis and I have been here since the beginning in 2017. I think we filed the suit in October of 2017. This whole operation seems like kind of an embarrassment for the legal profession. Lawyers fighting over fees and money. I wish it hadn't have come to that, Your Honor. I really did. I certainly wish it hadn't come to that as well. I think it doesn't look good for anybody involved. We're all folks who practice law. But anyway, we appreciate you having your say. We've got another five minutes left. Let's go back to Mr. Hurd. Thank you, Your Honor. Judge Novak, with respect to the question you asked me earlier, I took a closer look at that JA page 399. I believe we both may have somewhat misread it. It was referring to a single client plaintiff's settlement statement. Can you see that? I think the answer on the bottom, he says it would be an aggregate of several defendants. Yes, Your Honor, that's exactly what it says. An aggregate of several defendants, but not, as we may have misread it, not an aggregate of several asbestos client plaintiff's cases. A single client, asbestos client, will often have claims against several asbestos defendants. So that settlement statement will aggregate John Doe's claim against Defendant A, Defendant B, Defendant C. This does not suggest that the settlement statements are of different clients, different contracts, different cases. Well, I think those could be different cases because you're suing different defendants. That's what we're doing. But all under the same contract with a single client's claims against several asbestos defendants and a single settlement statement to KLF does not indicate that we thought there was some overarching agreement. Now, I'm not sure I agree with that, but I think the point, though, from that whole interchange where Mr. Napoli was speaking for himself was the reason he has chaos is because they were looking at him in terms of lump sums. But, you know, the record speaks for itself and we'll go back. You can probably find in the record that the opposing counsel pointed out some facts you thought were favorable to him that are favorable to us, including the fact that there was no written overarching agreement. If there was one or not, it's a question of intent, intent of the parties, and they concede that in that brief. And because it is a question of intent, it should go on to the jury. Well, it's still, look, to me, these problems still go back to the fact that your client just would not produce discovery. I mean, these are not regular defendants. They are attorneys. They have professional guidelines about how to handle their client's money. They should have been able to spit out quite quickly how much money was recovered on each of the lawsuits for each of their clients because the New York bar might have come in and asked them that. And they never did that. And had maybe everybody had that individual evidence, the case could have proceeded differently. But you all, your clients didn't do anything close to what is reasonable discovery in this case. So, Your Honor, my question might be the most important impact on the error of feeding all these cases as if they were all these contracts as if they were a single contract. Those personal jurisdictions, it was decided by the trial court judge to feed these cases all as one, these contracts all as one, to facilitate its finding of personal jurisdiction when, in fact, there was none. And certainly none, you know, maybe for the 40 cases that involved Maryland clients, maybe for them, for NDRS, but not for anybody else. And certainly not for Paul Napoli, who did not take an assignment of these cases. And even if he did, which is a theory the trial court proceeded by, the case law is very clear for the Fifth and Seventh Circuits, no opposing case law, that personal jurisdiction does not travel with the assignment of a contract. And with respect to the 2013 meeting in Maryland, Paul Napoli, if he was there, was there on behalf of NDRS, not himself, and that was well into this. Counsel, again, I realize you're over your time, but I want to ask a question about that. You keep mentioning that Mr. Napoli was traveling to Maryland and in contact with Keith's law firm in Maryland and negotiating about these Maryland contracts on behalf of his law firm. But why does that matter? I take your point that we can't impute contracts from the law firm to Mr. Napoli, but what Mr. Napoli personally did is attributable to himself, whether he did it for his law firm or for his own personal interest. He did it, and so it's no law of the contrary. In fact, the Fourth Circuit precedent pretty much says that you can't bar consideration of those sorts of personal jurisdiction contacts. You know, let me say that I have not said that Paul Napoli traveled repeatedly to Maryland. There's only one suggestion from the evidence that he went there one time in 2013. It was primarily the phone calls and e-mails that the trial court judge relied upon to find personal jurisdiction over NDRS, and then by... That wasn't. Those e-mails and those phone calls were to establish a relationship with a law firm in Maryland to take cases repeatedly over time and to consult with that law firm if there were questions about the cases, to remit fees to that law firm, to phone call or e-mail. You have to admit that. Joan, I will refer you to the consolidated engineers case that I quoted in my opening remarks where there were many phone calls and e-mails between a Virginia-based firm and one in Colorado to create a contract, and yet this court said that does not give rise to personal jurisdiction. So back to my original question, do you agree that things Mr. Napoli personally did should be considered for his own personal jurisdiction in Maryland? No, we don't, and we explained that, I thought, in our reply brief in response to opposing counsel's argument that under the Purdue standards, you have personal jurisdiction based on what the defendant does to promote itself. Now, that's a paraphrase, but the words Mr. Napoli did, he did on behalf of NDRS, and just as you can't say you have jurisdiction over him because he signed the company's contract, you can't say you have jurisdiction over him because he went to Maryland on behalf of the company. Now, in a court case, it would be different, but this is a contract case. What he did, he did solely as the agent for NDRS, and you cannot attribute NDRS's actions to him. Plus, you've got the assignment problem. Assignment is a matter of intent under New York law. Issues of intent or issues for the jury, this judge decided it on summary judgment, and that was inappropriate. Thank you. Thank you, Mr. Hurd. Mr. Walker? Thank you. Walter, I'm sorry. Mr. Walker, go ahead. Right ahead. Thank you, Governor. I want to address the constructive trust issue just for a moment. I guess the argument was made that that argument was waived. In fact, the argument was not waived. NDRS addressed it squarely in its brief, which all defendants adopted. Moreover, Judge Bennett's rulings and analysis should be upheld by this court. As Judge Bennett did go through, and to response to your question, Judge Novak, about standing, if you go back and reread Judge Bennett's opinion, he's pretty clear that the plaintiff does not have standing to raise that issue. He cites cases, which we cited to him, that say that you can't get standing by asserting a stand. I think my point was this. You're talking about his legal application to the facts. The only facts that I'm aware of that is in the record is this letter that was delivered on a Sunday night before trial began. By the way, I'm incredibly sympathetic, obviously, to Judge Bennett. I have KLF from paying money. It made no release at all of your client. In fact, they even say in the letter to the KFL folks that they would prefer that whatever money that they get that would have been attributed to the bankruptcy firm, that they give it to the clients. That seems to me that that relationship was only between the bankruptcy firm and KLF. It had nothing to do with the contractual relationship that your clients had with KLF. But I'm worried about the fact that the only thing we have in the record is the letter. That's what my point is. But if he would just rather have the account reinstated, I could go that route. I understand. I would point out that it's the plaintiff's burden to establish its standing to make the claim. Courts are not in the business of writing laws that are sort of floating out there. And so the argument about who gets that money has to be presented to a court and the party presenting it has to have a proper standing to make that argument. KLF no longer had standing. Its argument that it was entitled to the money because it had to give it to a third party evaporated. No, that's not what they're saying. They're saying they got to keep the money if they wanted to. If they could, they could be a volunteer, I guess. A lot of people are volunteers in New York, it looks like. But anyhow, they could volunteer to give the money to clients if they wanted to. But they had a contractual right to the money from your client. The question is what they did after they got it from your client. Well, what the contract says is that they are a conduit. They are, their right was to obtain the money on behalf of the David Wofford. That right was, the right to do that was negated by that letter. So what you have is nobody, the plaintiffs don't have that right anymore. And so they no longer have standing to make that claim. And so there is no proper issue before the court to resolve. I think that resolves it. And I don't think you need further, I don't think you need further facts. So you think the letter is enough for us to decide the issue? I do, Your Honor. So if we were in disagreement with you, then you would say that that's still enough to reinstate it as a matter of law? I'm not following you here. So if we were to disagree with you on the legal analysis, you would say that that's sufficient factual finding? The letter is sufficient facts to make a decision? Yeah, because I don't think that you can, I don't think that letter can be read in a way that creates standing for KLF to assert a claim for money that it was supposed to act as a conduit for. It never was going to be able to keep that money. And to the extent that it was supposed to get that money and hand it to a third party, the third party has lost its hands. So I think that sufficient for this court to say that it was correct. There is no party with proper standing before the court with respect to that money. I guess the other argument that I wanted to address is the New York general obligation law. And specifically what I wanted to ask this court to consider is, and I think that the argument that plaintiff's counsel has raised that Mr. Byrne was not a co-obligor, I think that's a pretty weak argument. I think the court can see through that one. And obviously the court knows that when plaintiffs apparently discovered that he was not a co-obligor, they didn't voluntarily give the money back. They kept it. But what I would ask the court to do is to look at general obligation law 15-105-2, which Judge Bennett did not deal with at all. He dealt with 15-105-1, but he never got to 15-105-2. And because he never mentions it, it was argued by us in the briefing that he never mentions it. So it's unclear in the record whether he didn't mention it because he missed it or because he decided it didn't apply and just failed to put that in his opinion. Doesn't the identification, the mutual identification provision that exists between Napoli and Byrne, render 105 completely irrelevant? I don't think so, Your Honor, because when Mr. Byrne settled the claim, he took out 50% of the liability. And that's what 15-105-2 deals with. And it doesn't matter whether KLF knew or had reason to know. The fact is, he took out 50%. And if you apply the 50%- The identification provision in the letter, the side letter, as I read it, says that if Byrne were to have any liability at all, your client would have to pay it anyhow. So if there is 50% of liability here, your client would have to pay. It's just like the reverse was true because it was a mutual identification, which to me sounds like 105 has no meaning. Well, Your Honor, I think I come to a different place on the side letter. What the side letter talks about is NDRS's obligation. So to the extent that this judgment was entered against NDRS and NDRS has to pay a dollar, 50 cents of that dollar has to be paid by Mr. Napoli and 50% has to be paid by Mr. Byrne. So Mr. Byrne's settlement took out 50%. I'm not sure- Then it goes farther and it says that once the cases are allocated, that if there's any liability for the cases that are assigned to Mr. Napoli, any liability that would then be associated with Mr. Byrne, Mr. Napoli has to reimburse full amount. And the flip side is true too, that for any of Mr. Byrne's cases, if Mr. Napoli was in jeopardy, Mr. Byrne would have to indemnify him, which to me knocks out 105. Am I missing something here? Well, Your Honor, the problem is there was no finding as to any of the 2,174 cases as to when liability attached. We know many of the cases were resolved before NDRS found out. And so there is no way to allocate and say, well, some part of the liability was Mr. Napoli's only and some part was a joint. It's all joint. Yeah, but would that not be then your burden? This would be an affirmative defense. You didn't even present this. Wouldn't it have been better if you wanted to assert 105 to put in front of the jury on a special verdict form, ask them, number one, are they, is Mr. Byrne a co-offender? Number two is, is what portion of it would be responsible? You could have made the argument that you're making. The other side could have made my argument about the indemnification and the jury could decide instead of waiting until now and erase this argument. Isn't that what waiver's all about? Well, but we tried, Your Honor, and Judge Bennett wouldn't let us. No, you tried to do a cross claim. You did try to put this in front of the jury. Your Honor, we did try. We asked in the conference to create the verdict sheet. We asked that Mr. Byrne be placed on the verdict sheet. The court refused. Under this statute? Yes. What's the, what's the site for that? I don't have that, Your Honor. I apologize. But we don't, I mean, you know, we were, we were blocked completely from asserting Byrne's liability at any time in the trial. Once the cross claim was denied, that was it. And so, you know, as well as the fact, Your Honor, that the plaintiffs did not raise this issue before Judge Bennett below when Judge Bennett was applying the New York General Obligation Law. So that issue, in my view, was waived by them at that point. And it looks like I'm out of time, Your Honor. You're out of time. Does anyone else, Judge Rushing, you got any questions? No, thank you, Judge King. Judge Novak? I'm all good, thank you, Judge King. Thank you, Mr. Walters. Now, Mr. Shuster? Thank you. So Judge, they did ask Judge Bennett whether Mr. Byrne could be on the, on the verdict sheet, and Judge Bennett said no, because there had been no theories to that. He specifically was addressing the idea that nobody on the defense side put in any evidence that Mr. Byrne was a co-obligor. That's why Mr. Byrne didn't go on the verdict sheet. There was no evidence. He, the judge was open to it. He talked about it in pretrial hearings and actually told him, if you can get your act together, you can put on that evidence. And when the opportunity came, they asked for Mr. Byrne to be on the verdict sheet. Judge Bennett appropriately, appropriately declined to do that. Section 15-102 just doesn't apply. The plain language of the, of the statute deals with settlements where the other party is not a part of the case. So that, that, that's why 102 doesn't apply. In my, in my closing remarks, I just want to, I think it'll help focus things because I feel like it's really important to talk about what Bennett was up against. Mr. Napoli is a sophisticated lawyer. Sorry, before you, sorry, I don't, I want to let you say what you need to say, but I want to ask you a question about constructive trust on the rebuttal issues. So there's been a question about the letter and I think, you know, that is all we have to go on. So in the letter, the bankruptcy firm says none of the parties or their counsel is authorized to speak or act for the firm. Now, is that, that seems to go to, you know, third-party standing, whether you can assert a claim on their behalf or write to the money on their behalf. But, you know, are we reading too much into that language? What, what should we make of that language in the letter? I took it to mean that at trial, I wasn't supposed to say anything about what DLF wanted out of the case or that's how I took it. But I don't believe that they, that the lawyer for DLF was, was saying that Mr. Napoli gets to keep the money. And he wasn't saying that we don't have the right to collect it. Basically just saying, if you collect it, you don't have to give it to us. We'd actually prefer for it to go to the clients, which is something that we discussed with Judge Bennett when this issue came up. I was, I was going to say, and I think it's important because it frames the cross appeals and it frames the, the case in general. Everybody knows Mr. Napoli holds himself out as a sophisticated lawyer. He says his firm and he and his firm have the capacity and resources to represent thousands and thousands of clients at a time in mass tort cases. And, but unfortunately is, he and his firm's engaged in unrelenting discovery violation. There was a carousel of the case, taking positions that were contrary to what their predecessors did. They misrepresented what had happened. They weren't involved, so they didn't know. And Mr. Napoli was determined never to provide a complete account. At summary judgment, they dumped literally 13 boxes of documents, pointed to the boxes and said, that that's our, that's our account. And we wouldn't. That was their position. Then, you know, on the Friday before the start of the trial, a box of checks arrives in my client's mailbox totaling $322,000. No, no accounting, no settlement statements, no nothing, just a box of checks. And that, and this was after two years of them saying my client's case was, was bogus. They filed two lawsuits in New York state court against my client, seeking relief of a state court judge, directing my client to abandon her federal case. They did that. The weekend before the start of trial, Mr. Napoli attempted to intimidate a witness from coming to Baltimore to testify. They falsely accused Judge Bennett of homering them. And I haven't even scratched the surface. In a trial, and on this matter, it was relevant. Well, it was highly relevant. It was directly relevant to the uncertainty that they created in the data. And that was what enabled the jury, should have enabled the jury to, to rely on the error rates. And for that reason, we thought it was, it was incorrect with Judge Bennett to, to reduce the judgment to account for that. It was their uncertainty. They created it. And Judge Bennett wouldn't let them come into court and pretend as though they had produced everything and done a proper accounting. They didn't lose because of any legal errors. They, they lost because the evidence was overwhelmingly against them, because they had no credibility. My time is up. And unless the court has any questions, I'll, I'll sit down. It was a great privilege to honor, to all of you in front of everybody here. Thank you. Judge King, I've never done this before, but I must, if I may, note my objection to opposing counsel's use of his promotal time to attack my client. Mr. Heard, your time is expired. We've heard this case. We've given everybody extra time. We've read very patiently, listened to your arguments, and we thank you. We appreciate what you've done, the hard work you've put in this case. And with that, we will take the, the case under advisement. It'll be submitted. And Madam Clerk, you may call this next case.
judges: Robert B. King, Allison J. Rushing, David J. Novak